Mary KANE, as Administratrix of the goods, chattels and credits of Edward Kane, deceased, Plaintiff,

v.

BRANCH MOTOR EXPRESS COMPANY, Defendant.

United States District Court
S. D. New York.

Feb. 11, 1960.

Sylvia Miller, New York City, for plaintiff Chester Hahn, New York City, of counsel.

John P. Smith, New York City, for defendant John Olmstead, New York City, of counsel.

HERLANDS, District Judge.

This is an action for wrongful death under the New York statute,[1] grounded on the alleged negligence of defendant, Branch Motor Express Co. It was tried to the court, without a jury.

The complaint was filed May 15, 1957. Jurisdiction of the court is based upon diversity of citizenship. Plaintiff is a citizen of New York. Defendant is a Pennsylvania corporation. The amount in controversy exceeds $3,000.

Defendant, an interstate common carrier of merchandise, owned a semitrailer of 3,000 pounds or more gross weight, registered and licensed by the Interstate Commerce Commission, and identified by defendant's number 3062.

The decedent operated a fork-lift truck, called a hilo. He was employed by the St. Johnsbury Trucking Company, also an interstate common carrier. He worked in its New York City terminal, loading and unloading freight.

Shortly after midnight on the date of the accident (February 11, 1957), the semitrailer belonging to defendant, but then being operated by St. Johnsbury, was driven from the roof of the terminal two stories down a ramp to the street level. The driver backed it up to the loading platform for unloading and disengaged the trailer from the truck-tractor with which he had towed it.

On disengaging a tractor and a trailer, an automatic arrangement in the trailer's airbrake system is tripped, and its brakes are applied. There is nothing in the evidence to suggest that that did not happen here.

The driver also blocked the left front rubber-tired wheels (of the left tandem set) with one of several ordinary blocks of wood which were kept about the platform for that purpose. It was about 4 by 6 inches, and 27 inches long. He also placed a smaller block of wood between the right wheels (of the right tandem set). The decedent asked, as he always did, "You got it blocked up?"

The driver answered that he had. (Tr. 78)

The trailer remained stationary in that position for about seven hours while being unloaded. The floor of the trailer was about six inches higher than the top surface of the platform. A metal plate, resting on the platform and the trailer floor, served as a ramp and provided access for the hilo.

At about 7:30 a. m., with only one item of freight remaining to be unloaded, the decedent, driving the hilo, began his fatal trip into the trailer. When the hilo's front wheels were on the plate, the trailer rolled away from the platform. The hilo overturned and fell. The decedent was killed.

There is evidence that an improper metal plate was used. Several times before the fatal trip, as the decedent backed his hilo out of the trailer, the plate moved a few inches from its place in toward the platform. It is not unknown for the wheels of a hilo to spin a plate out from under. A mechanical engineer testified that the trailer could have been pushed over the wooden chocks by a force of 1603 foot pounds, and that the hilo was capable of a thrust of 4000 foot pounds. Thus, although a finding on the point is not necessary, there is ample reason to infer that, the plate having slipped so that it no longer acted as a ramp, the front wheels of the hilo struck the six inch face of the nearly empty trailer and pushed it over the chocks.

When the trailer was first parked at the platform, it was held immobile by its airbrake system and, perhaps, also by the blocking of its wheels. About seven hours later, when the accident took place, substantially all the air had leaked from the airbrake system and, therefore, the brakes were not in application. Had the system retained its air, the accident would not have occurred. That is the factual basis upon which this suit is brought.

The trailer was purchased new by defendant early in 1954. It was equipped

1. Decedent Estate Law, § 130 et seq.

with Bendix-Westinghouse Pneumatic Brakes and mounted an air tank 36 inches by 7 inches with four 9 inch brake chambers operating with four sets of dual rear wheels, each set having two rear wheels. The front of the trailer was supported by a landing gear consisting of a metal framework assembly with two metal wheels on which the forward part of the trailer rested when parked.

Defendant delivered the trailer to St. Johnsbury on February 5, 1957 with a shipment of machinery weighing nine and one-half tons, destined for Portland, Maine. Rather than transfer the cargo to another vehicle, defendant left the laden trailer with St. Johnsbury pursuant to an interchange agreement.[2]

The trailer was inspected by three St. Johnsbury employees before it was accepted; but the inspection report does not show specifically that the brakes were tested or examined. St. Johnsbury then took the trailer to Portland, with a stopover at Portsmouth. The return trip left Portland February 8th, and returned to the New York terminal the next morning.

The accident occurred on February 11th. Thus, the trailer was out of defendant's custody for six days and traveled perhaps a thousand miles during that period.

Plaintiff contends:

(1) that the airbrake system was defective because it leaked air; and

(2) that defendant was negligent in (a) failing to instal or to maintain the airbrake system in conformity with the Interstate Commerce Commission Safety Regulations for motor carriers (discussed in detail below), (b) failing to maintain the airbrake system in conformity with the common law standard of due care, and (c) failing to warn the decedent of the danger.

Defendant contends:

(1) that the airbrake system on the trailer was not defective, notwithstanding that it leaked air;

(2) that the Interstate Commerce Commission Safety Regulations have no application to a vehicle off the highway, such as the trailer herein when parked at the platform;

(3) that no such regulation requires that trailer airbrakes be adequate to hold a detached trailer for more than fifteen minutes; and

(4) that, consistently with the standard of due care, airbrakes normally lose their air by leakage over so many hours; and they are neither designed nor used in the industry to hold a parked, detached trailer.

The force that applies the brake shoes to the brake drums in an airbrake system is compressed air, at some pressure in excess of atmosphere. In normal, on-the-road operation, that pressure is about 105 pounds per square inch. The compressed air is continuously supplied by a compressor which is run off the vehicle's engine and stored in one or more reservoirs. The operation of certain valves by the driver or automatic, allows the compressed air to flow from the reservoirs into the brake chambers, where it actuates the brake shoes.

In a tractor-trailer combination, each vehicle has its own reservoir and brakes. However, only the tractor has the engine and compressor. The trailer reservoir is charged from the tractor reservoir through a hosing called "the emergency line." In normal road operation, this emergency line is open and equalizes the pressure in the two reservoirs. Another line, called "the service line," is used for service application of the brakes.

When the emergency line is vented to the atmosphere by any means—as by

---

**2.** The Trailer Interchange Contract provided, among other things, that St. Johnsbury Trucking Company had complete control and supervision of the trailer and that the trailer should be operated under St. Johnsbury's common carrier responsibility and that St. Johnsbury should make all emergency repairs.

uncoupling the trailer from the tractor or accidental "breakaway"—the pressure from the trailer reservoir, no longer counter-balanced by pressure from the tractor reservoir, automatically trips a complex valve, called a relay emergency valve. This closes the emergency line and permits air to flow from the trailer's reservoir into its brake chambers, applying the brakes. Defendant's trailer had an airbrake system of this common type.

All airbrake systems which have been in service for some time leak air. When a vehicle is on the road, leakage at less than a certain rate has no serious consequence, because the reservoirs are continuously charged, and any leaked air is replaced. However, when a vehicle is parked, leakage eventually depletes the reservoir and the airbrakes become ineffective. Generally, leakage is through the valves, particularly the check valve, the component which confines the air to the system upon uncoupling.

This does not pose a problem for trucks or truck-tractors, as distinguished from trailers. Generally, trucks or truck-tractors are equipped with mechanical parking brakes—independent of and separate from the airbrakes—capable of holding the truck or truck-tractor and any attached trailer. Mechanical parking brakes are required equipment by the Interstate Commerce Commission for certain vehicles subject to its Safety Regulations.[3]

Air leakage is a problem with regard to a trailer when detached from the tractor and parked alone. Trailers are generally not equipped with mechanical parking brakes, although such are available; and there is no requirement that they be.[4] Defendant's trailer was not so equipped.

The normal rate of leakage is such that, without replenishment, even a reasonably well-maintained trailer which has been in service for some time will lose substantially all of its air within six to twelve hours, and its airbrakes will then become ineffective.

Motor carriers, including the decedent's employer, and their employees, are aware of this routine phenomenon. Hence, they do not rely upon the airbrake system to hold a detached trailer any longer than necessary to block or "chock" its wheels. The mast of decedent's hilo was stencilled, in full view of the driver, "Be Sure Trailer is Chocked" (Exhibit "A"). The decedent was aware of this situation; and he relied upon the regularly used expedient of chocking. The decedent always checked with the driver; and he did so on the fatal occasion.

Trailer airbrakes are not designed for parking. An executive of Bendix-Westinghouse, the largest American airbrake manufacturer and the company whose equipment was installed on defendant's trailer, testified that the system was not designed to hold a detached trailer indefinitely, but that it will hold for thirty-five minutes.

A pamphlet of instructions issued by his company warns, in heavy black type:

"Do not use the airbrake system to hold a vehicle parked: Either block the wheels or apply parking brake."

A few pages later, it says:

"If a trailer is disconnected from a tractor for loading or unloading * * * the wheels should be blocked to avoid the possibility of a runaway."

The latter quotation anticipates the type of accident which occurred in this case.

Another Bendix-Westinghouse executive, an engineer, testified that there is sometimes a hand-control valve in the tractor cab, by which the driver can operate the trailer airbrakes independently of the tractor's. The handle for this control bears the legend "Not for parking."

3. I.C.C. Safety Regulations §§ 193.40, 193.-41, infra, pp. 15–16.

4. Id.

Several witnesses, including an Interstate Commerce Commission inspector, testified to a standard of safety which requires that airbrakes of a detached trailer maintain their application for between twenty minutes and one hour. The leakage rate tests generally used are consistent with this standard. Interstate Commerce Commission inspectors often use a gauge and a stop-watch in measuring the rate of leakage.

■ Plaintiff contends that, whatever may be the standards or practices of the industry, the Interstate Commerce Commission Regulations override them, govern the design, manufacture and maintenance of trailers, and set up a statutory standard of due care. To the extent, if any, that the Regulations and the industry practices are inconsistent, this contention of plaintiff is sound.

■ Defendant's argument, based on the language of § 190.1[5] of the Regulations—that they do not apply to equipment in use off the highway—is rejected. It is a strained interpretation which, without warrant, would deny the benefit of these remedial provisions to terminal employees and to others who may be endangered by defective vehicles elsewhere than on the highway. The language of § 190.1 is descriptive and not limiting. In an I.C.C. decision, the Commission stated that its safety rules apply to vehicles being unloaded in a terminal.[6]

The regulations on which the plaintiff relies are 49 C.F.R. §§ 193.40 through 193.52, and § 196.2. Particularly, plaintiff asserts that defendant failed to comply with §§ 193.45, 193.46, 193.48 and 196.2.

Section 193.48, on which plaintiff places greatest emphasis, provides that "all brakes * * * shall be operative at all times * * *." Three exceptions are provided: (1) Certain conditions described in another section as a driveway-towaway operation; (2) Brakes on disabled vehicles being towed; and (3) Reduction or removal of braking effort on the front wheels of certain specifically described vehicles for operation "under adverse road conditions such as wet, snowy, or icy roads."

Plaintiff contends that, within the meaning of § 193.48, the brakes on defendant's trailer were not "operative" at the time of the accident.

■ "Operative" is not a word of clear and single meaning.[7] In the context of § 193.48, it means "in good working order." The section articulates the Interstate Commerce Commission's policy as expressed in the following language of the order by which it adopted the revised Safety Regulations:[8]

"One of the most important safety devices available to the driver is the vehicle braking system. It must be adequate and *in good working order at all times* if the purposes of safety are to be served." (Emphasis added.)

The standards for determining whether brakes are operative are not found in § 193.48, but in other sections of these detailed and comprehensive regulations; particularly, in the case of trailers, §§ 193.43[9] and 193.52.[10]

---

5. "§ 190.1 *Motor Vehicle.* The term "motor vehicle" means any vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used upon the highways * * *."

6. Joe D. Hughes, Inc., 23 M.C.C. 563, 564 (1940).

7. Webster's New International Dictionary, 2d ed. 1953 defines "operative" as: "(1) having the power of acting; exerting force or influence; operating; (2) producing the appropriate or designed effect; efficacious."

Funk & Wagnall's New Standard Dictionary, 1938, has this definition: "(1) Exerting power or force; active; (2) Working or acting efficiently; producing the proper or desired result; effective."

8. Ex parte No. MC–40 (1952), 54 M.C.C. 377, 351.

9. Infra, p. 17.

10. "§ 193.52 *Brake Performance.* Every motor vehicle or combination of motor

Section 193.48 makes possible strict enforcement of these other sections and of the Commission's policy by listing, exclusively, the three highway[11] situations in which they need not be obeyed. It precludes argument as to whether a particular practical highway situation justifies non-conformance. Thus, it is concluded that § 193.48 deals with the applicability of other sections, and does not itself set a standard of performance. Section 193.48 cannot be read to require that the airbrake system of a detached trailer maintain effective air pressure indefinitely unless such a requirement can be found elsewhere.

■ Similarly, § 196.2—which requires that accessories (including brakes[12]) be inspected and maintained to insure that they are "in safe and proper operating condition"—is intended to effectuate and enforce standards of performance and design as prescribed elsewhere in the Regulations. Section 196.2 itself does not set up any such standard.

Plaintiff's reference to § 193.45 is inapposite. That section sets standards for brake-tubing and hose. There is no evidence in the case that those components of the defendant's trailer's airbrake system failed to conform.

Section 193.46(b) requires that brake tubing and hose connections "be designed, constructed, and installed so as to insure, when properly connected, an attachment free of leaks, constrictions or other defects." This is neither an express nor an implied requirement that an entire airbrake system be airtight. The thrust of § 193.46(b) is directed to the design, construction and installation of particular components, i. e., brake tubing and hose connections. There is no such requirement for valves, which (the evidence indicates) are the components most likely to leak.

Larry Shore, who inspected defendant's trailer shortly after the accident, testified that he applied saliva to each of the fittings, and the resulting bubbles showed no visible expansion. Although by industry standards this indicates a good fitting, not a defective one, the very existence of bubbles indicates that the tested fittings are not absolutely "free of leaks." Whether such minimal leakage is proscribed by § 193.46, this court need not determine. There is no evidence that it was caused by the design, construction or installation of the fittings (brake tubing and hose connections), the only features to which § 193.46 is addressed.

The gist of plaintiff's contentions is that the Interstate Commerce Commission Safety Regulations, although nowhere expressly so providing, require that a trailer airbrake system be absolutely leakproof and adequate for parking, i. e., that it be capable of holding the parked trailer stationary for an indefinite time. None of the sections on which plaintiff relies supports such a reading. Rather, considered as a coherent whole, the Safety Regulations reveal a contrary regulatory pattern.

vehicles shall, upon application of the service brakes, be capable, at all times and under all conditions of loading, of being brought to a stop within a braking distance of 30 feet from a speed of 20 miles per hour * * *."

11. Although the court has held that the Safety Regulations apply to off-the-highway situations where they logically may, it is apparent from a reading of the Regulations and of extrinsic materials that the Commission was concerned with highway safety in formulating the rules, and had only highway situations in mind. Thus, the rules do not contain provisions regulating terminal procedures or equipment. In the order by which it adopted the revised Regulations, Ex parte No. MC–40 (1952), 54 M.C.C. 337, the Commission said (at p. 343):

"[T]hese revisions represent * * * reasonable and necessary minimum requirements in the light of the current highway traffic problem * * *." (Emphasis added.)

Language of similar purport is found at pp. 340 and 358 of the Order.

12. Section 196.2 refers to "the accessories required by Part 193."

The Regulations implicitly permit trailers to be without brakes adequate for parking. Section 193.40 provides:

> *"Adequacy of brakes.* Every bus, truck, truck-tractor, and combination of motor vehicles * * * shall be equipped with brakes adequate to control the movement of, and to stop and to hold, such vehicle or combination of vehicles. Two separate means of brake application shall be provided. One such braking means shall be a mechanical parking brake * * *."

Section 193.41 provides:

> *"Parking brakes.* Every bus, truck, or truck-tractor shall be equipped with parking brakes capable of locking the rear driving wheels and adequate under any condition of loading to hold, to the limit of traction of such braked wheels, such vehicle or combination of vehicles to which such motor vehicle may be attached * * *."

The court may not obscure what the Interstate Commerce Commission has taken such pains to make clear: that not "every motor vehicle" (a phrase frequently used in these Regulations), and not trailers, but only those vehicles specifically listed in these sections, are required to have brakes adequate for parking.

It is not without significance to observe that, while trucks and truck-tractors have airbrake systems, the Interstate Commerce Commission—determining it is necessary for safety that trucks and truck-tractors have brakes adequate for parking—did not rely on their airbrake systems for parking purposes, but required (Regulations §§ 193.40 and 193.-41) that they be equipped with mechanical parking brakes. Evidently, airbrakes were considered inadequate for parking.

This reflects the experience that, in the present state of technology, airbrakes, however well maintained, leak and lose effective air pressure over a rather short period of time.[13]

The "breakaway" section, § 193.43, fits into this regulatory pattern. It provides, in pertinent part:

> "Every * * * semitrailer * * * shall be equipped with brakes of such a character as to be applied automatically and promptly upon breakaway from the towing vehicle, and means shall be provided to maintain application of the brakes on the trailer in such a case for at least 15 minutes."

Inasmuch as the very same equipment, operating in the very same manner, is involved in breakaway and in parking, it would be anomolous to imply a requirement that these same airbrakes be adequate to hold the trailer parked indefinitely.

Section 193.43 is the only section of the Regulations that deals explicitly with application time. Its purpose is "to provide ample time for the securing of the separated vehicle against further movement.[14] If airbrakes were required to be airtight and adequate for parking, as plaintiff contends, the words "for at least 15 minutes" would be surplusage and meaningless, and no "securing" would be necessary.

The Safety Regulations' treatment of brakes for vehicles other than trailers, and their treatment of trailer equipment (including brakes) are both so detailed and explicit that they compel the conclusion that the Interstate Commerce Commission consciously decided not to require that trailer airbrake systems be adequate for parking. Thus

---

13. Tractor braking systems are presently so designed that application of the airbrakes cannot be maintained without pressure on the foot pedal. Plaintiff argues that this is the reason why mechanical parking brakes are required on tractors. Adequate evidence for a finding on this point was not presented; but it appears reasonable that a check-valve could be so incorporated into the tractor airbrake system that application of the airbrakes could be maintained for as long as the system retains effective air pressure.

14. Ex parte No. MC–4 (1936), 1 M.C.C. 1, 15.

read, the Regulations are consistent with both the nature of the equipment and the experience, standards and practices of the industry.

Were the court to adopt plaintiff's interpretation, it would necessarily follow that the Safety Regulations are, in this area of their application, universally misunderstood and violated by brake and trailer manufacturers and motor carriers.

It may be that injury and loss of life would be prevented by a requirement that trailer airbrake systems be absolutely airtight and adequate for parking. But that policy consideration must be addressed to the Interstate Commerce Commission, the administrative expert in the field. It would be unwarranted judicial legislation for this court to so "interpret" the Safety Regulations.

In large measure, the foregoing discussion also disposes of plaintiff's common law negligence theory. There was no evidence that defendant's trailer's brakes were defective in any particular. The system held effective air pressure and maintained application of the brakes for seven hours, as long as it could reasonably be expected to, and much longer than anyone in the industry, in the exercise of due care, would have relied on it to do. The decedent was aware of the danger. He did not rely on the brakes. There was no need for defendant to warn him. Such a warning would not have prevented the accident.

No evidence was presented to support an inference that it was a general practice in the industry, at the time of the accident, to equip trailers themselves with chocks; or that the outfitting of a trailer with such equipment is necessary to prevent injury to such persons as the decedent. Similarly, it was not shown that fitting trailers with mechanical parking brakes is such a practice or necessity.

There is some evidence that defendant failed to inspect and adjust the brakes as frequently as it should have. However, since the brake system was not de-fective and it performed properly, this failure was not a legal cause of the accident.

So far as anything is concerned which might have been a contributing cause of the accident, defendant's trailer was equipped, maintained and used by defendant in compliance with all applicable Safety Regulations of the Interstate Commerce Commission and in conformity with all applicable common law duties of due care and reasonable prudence.

This opinion incorporates the court's findings of fact and conclusions of law. Judgment shall be entered in favor of defendant, dismissing the complaint on the merits.